Filed 4/23/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GUSTAVO E. VASQUEZ,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GREENE MOTORS, INC. et al.,<br><br>     Defendants and Appellants. | A134829<br><br>(Solano County<br>Super. Ct. No. FCS038384)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 27, 2013, be modified as follows:

1.  On page 26, replace existing footnote 20 with the following footnote:

[20] We also reject two other arguments of Vasquez: (1) the contract is substantively unconscionable because it requires him to give up the right to judicial determination of certain statutory rights without requiring Greene and Honda to give up similar rights of their own, and (2) the arbitration clause should not be enforced because he did not expect to find it in the contract. As to the first, putting aside Vasquez's failure to specify exactly what rights he has in mind that Greene and Honda might sacrifice, a lack of unconscionability has never been held to depend on this type of tit-for-tat exchange. As to the second, the Supreme Court has not mentioned the "reasonable expectations" test in evaluating the enforceability of an arbitration clause since 1985, in *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 416, footnote 9. Even assuming this is an appropriate standard, it cannot be said that the presence of an arbitration clause in a preprinted consumer contract contravenes the "reasonable" expectations of a consumer, given the modern ubiquity of such clauses.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

Dated:

_____
Margulies, Acting P.J.

A134829
*Vasquez v. Greene Motors, Inc.*

Filed 3/27/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GUSTAVO E. VASQUEZ,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>GREENE MOTORS, INC., et al.,<br><br>  Defendants and Appellants. | A134829<br><br>(Solano County<br>Super. Ct. No. FCS038384) |

After plaintiff Gustavo E. Vasquez purchased a used car on credit from defendant Greene Motors, Inc. (Greene), the vehicle's financing was assigned to defendant American Honda Finance Corporation (Honda). When Vasquez later sued Greene and Honda in connection with the terms of the financing, defendants petitioned the superior court to compel arbitration of the matter under a clause in the sales agreement. Vasquez opposed the petition on the ground the arbitration clause, contained on the back of a complex, one-page, preprinted document, was procedurally and substantively unconscionable. The trial court agreed and denied the petition to compel.

Because the arbitration agreement was imposed on Vasquez without the opportunity for negotiation, and was therefore adhesive, we agree the transaction was procedurally unconscionable. In light of the minimal level of procedural unconscionability and the absence of significant substantive unconscionability, however, we reverse the trial court's denial of the petition to compel.

# I. BACKGROUND

Vasquez sued Greene and Honda in a complaint filed August 18, 2011, alleging causes of action under the Rees-Levering Automobile Sales Finance Act (Civ. Code,[1] § 2981 et seq.), the Consumers Legal Remedies Act (§ 1750 et seq.), and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.).  The complaint alleged Vasquez purchased a used vehicle on credit from Greene, a car dealership, on January 31, 2009, executing a retail installment sale contract.  Soon after, Greene contacted Vasquez, told him it had been unable to find third party financing for the transaction, and asked him to execute a second retail installment sales contract.  This second contract (hereafter the Contract) was on an identical form to the first but contained somewhat different financial terms.  The sales contract was eventually assigned to Honda.

Although the Contract was executed on February 2, 2009, Vasquez alleged, Greene backdated it to January 31, 2009, the date of the original sale.  According to the complaint, the backdating caused the financing terms in the Contract to be inaccurate, and "[t]he actual annual percentage rate, based on a contract consummation date of the final purchase contract, may have varied from the disclosed annual percentage rate by more than Regulation Z [(12 C.F.R. § 226.1 (2013))] permits."  Based on the variance created by the three-day discrepancy, Vasquez sought unspecified consequential and general damages, restitution, punitive damages, interest, an injunction against future similar conduct, and attorney fees.

Greene and Honda filed a petition to compel arbitration on the basis of an arbitration clause contained in the Contract.  Vasquez opposed the petition on grounds the arbitration clause was unconscionable.

The Contract was a preprinted form that is apparently commonly used by vehicle sellers in California.[2]  It is a single piece of paper, 26 inches long, with dense printing on both sides.  On the upper half of the front page, contained in a series of boxes, are

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

[2] The form, No. 553-CA-ARB, printed by the Reynolds and Reynolds Company, is discussed in other appellate decisions involving car dealers and manufacturers.

provisions relating largely to the financial terms of sale, credit, and insurance. Many contain blank spaces filled in by the seller for the particular transaction. The buyer is required to sign the Contract in 10 different places. Four signed provisions concern the purchase (or declining) of optional items, such as insurance and a service contract. The remaining signed provisions are acknowledgments of various legal matters: the contract can be amended in writing only, the buyer must obtain liability insurance, the seller is relying on the buyer's representations, the seller may cancel if the agreement cannot be assigned, and the buyer has certain legal remedies. Some of these signatures are required by law. (See §§ 2982, subd. (h); 2984.1.) Above the final signature line, on the right-hand side, is a statement in all capital letters acknowledging the buyer was given an opportunity to "take and review" the contract and has read "BOTH SIDES" of it and noting the presence of an arbitration clause "ON THE REVERSE SIDE."

The reverse side, also dense with text, contains a number of provisions in separate boxes, many dealing with typical "boilerplate" legal matters, such as warranties, applicable law, and buyer and seller remedies. None of the provisions on the back page requires a buyer's signature. Toward the bottom of the page is the arbitration clause. The entire text of the clause is outlined in a black border. In all capital letters and bold type at the top is written, "**ARBITRATION CLAUSE [¶] PLEASE REVIEW— IMPORTANT—AFFECTS YOUR LEGAL RIGHTS**." Immediately below, three numbered provisions, also in all capital letters, inform the buyer either party may request arbitration, this would prevent a court or class-wide proceeding, and it might limit discovery. Below these, in smaller type, are the actual terms of the clause. Pursuant to these terms, the arbitration may be conducted under the auspices of the National Arbitration Forum or the American Arbitration Association (AAA), at the election of the buyer, or by any other mutually agreeable organization; the initial arbitration will be conducted by a single arbitrator; it will occur in the federal district of the buyer's residence; the seller must advance up to $2,500 of the buyer's arbitration costs; the award is binding unless it is $0 or more than $100,000 or includes injunctive relief, in which

3

case either party can request a second arbitration before three arbitrators; and the use of self-help remedies and small claims court is exempted.[3]

Vasquez submitted a declaration stating that at the closing of the purchase, he "was presented with a stack of documents, and was simply told by the Dealership's employee where to sign and/or initial each one. All of the documents (including the purchase contracts) were pre-printed form documents. When I signed the documents, I was not given an opportunity to read any of the documents, nor was I given an opportunity to negotiate any of the pre-printed terms. [¶] . . . The documents were presented to me on a take-it-or-leave-it basis, to either sign them or not buy the car. . . . I had no reason to suspect that hidden on the back of the contracts that told me how much the vehicle cost and how much my monthly payments would be was a section that prohibited me from being able to sue the Dealership in court if I had a problem. [¶] . . . [T]he Dealership did not ask me if I was willing to arbitrate any disputes with it, did not tell me that there was an 'arbitration clause' on the back side of the purchase contracts, and I did not see any such clause before I signed the documents."

The trial court denied the petition to compel arbitration, relying on a since-depublished opinion, *Sanchez v. Valencia Holding Co., LLC* (2011) 201 Cal.App.4th 74 (*Sanchez*), review granted March 21, 2012, S199119, in finding the arbitration clause unconscionable by reason of "adhesion, oppression, and surprise."[4]

---

[3] For reasons of concision we have not quoted the entire clause, but we quote specific challenged provisions when discussed in the next section.

[4] The Supreme Court has also granted review of a second decision that, like *Sanchez,* considered the same preprinted vehicle purchase contract addressed here. (*Goodridge v. KDF Automotive Group, Inc.* (2012) 209 Cal.App.4th 325, review granted and briefing deferred Dec. 19, 2012, S206153.) At the time of our writing, there are two published decisions addressing the identical contract, *Flores v. West Covina Auto Group, LLC* (2013) 212 Cal.App.4th 895 (*Flores*) and *Natalini v. Import Motors, Inc.* (2013) 213 Cal.App.4th 587 (*Natalini*). Both are the subject of currently unresolved petitions for review in the Supreme Court. We do not directly address *Flores* and *Natalini*, but the arguments raised in those decisions are essentially identical to the arguments addressed in this decision.

**II. DISCUSSION**

Greene and Honda contend the trial court erred in denying enforcement of the arbitration clause on grounds of unconscionability.

## A. *Legal Background*

Through enactment of a comprehensive statutory scheme regulating private arbitration, the Legislature "has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.) "The policy of [California's] law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing." (*Utah Const. Co. v. Western Pac. Ry. Co.* (1916) 174 Cal. 156, 159, disapproved on other grounds in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 27.) Thus, California law establishes "a presumption in favor of arbitrability." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971.)

When seeking to compel arbitration, the petitioner bears the burden of proving that an agreement to arbitrate exists, while the opponent has the burden of proving the facts of any defense to enforceability. (*Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 708.) Notwithstanding the "highly favored" status of arbitration (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 189), an agreement to arbitrate may be avoided on the same "grounds as exist for the revocation of any contract" (Code Civ. Proc., § 1281). The most commonly asserted ground for refusing to enforce an arbitration agreement is the one asserted here, unconscionability. "Unconscionability is ultimately a question of law, which we review de novo when no meaningful factual disputes exist as to the evidence." (*Chin,* at p. 708; see § 1670.5.)

" '[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results. [Citation.] 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a

court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).)

"Procedural unconscionability focuses on the elements of oppression and surprise. [Citation.] Oppression occurs where there is an inequality of bargaining power which results in a lack of real negotiation and an absence of meaningful choice." (*Lanigan v. City of Los Angeles* (2011) 199 Cal.App.4th 1020, 1035 (*Lanigan*).) The classic example of oppression is the use of a contract of adhesion—a contract presented without the option of negotiation, on a take-it-or-leave-it basis. "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, ' "which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." ' " (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071 (*Little*).) Surprise is " 'a function of the disappointed reasonable expectations of the weaker party' " (*Higgins v. Superior Court* (2006) 140 Cal.App.4th 1238, 1252) and "results from misleading bargaining conduct or other circumstances indicating that a party's consent was not an informed choice" (*Dotson v. Amgen, Inc.* (2010) 181 Cal.App.4th 975, 980). Most often, "[s]urprise involves the extent to which the terms of the bargain are hidden in a verbose printed form drafted by the party in a superior bargaining position." (*Lanigan*, at p. 1035.)

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. [Citations.] A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." ' "

(*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246 (*Pinnacle*).)

## B. *Procedural Unconscionability*

There is little question the Contract is procedurally unconscionable under California law. Absent unusual circumstances, a contract offered on a take-it-or-leave-it basis is deemed adhesive, and a commercial transaction conditioned on a party's acceptance of such a contract is deemed procedurally unconscionable. (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 (*Gentry*).) As the Supreme Court noted in *Gentry,* "Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability *even without any notable surprises,* and 'bear within them the clear danger of oppression and overreaching.' " (*Ibid.*, italics added.)[5] Greene's use of a preprinted contract, without offering Vasquez the opportunity to negotiate its terms, qualified the transaction as procedurally unconscionable.[6]

It is generally said that a finding of procedural unconscionability depends on inequality of "bargaining power." (E.g., *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 109 [adhesive contract procedurally unconscionable where one party has

---

[5] A number of other decisions have also held the use of a nonnegotiable contract, standing alone, to be sufficient to support a finding of procedural unconscionability. (See *Arguelles-Romero v. Superior Court* (2010) 184 Cal.App.4th 825, 843; *Dotson v. Amgen, Inc.*, *supra*, 181 Cal.App.4th 975, 981; *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1100; *Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 585.)

[6] We have found only a small number of decisions in which a nonnegotiable contract was found *not* to involve procedural unconscionability, generally involving unusual circumstances. In *Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634 (*Walnut Producers*), for example, not only were the parties sophisticated businesspeople—walnut growers and a walnut processor—but the growers were found, in effect, to have imposed the nonnegotiable contract on themselves through their prior dealings with the processor. (*Id.* at p. 646.) Similarly unusual is *Pinnacle, supra*, 55 Cal.4th 223. Although the Supreme Court found the use of a contract of adhesion in the purchase of a condominium unit not procedurally unconscionable, it relied on the unique nature of condominium sales, in which a contract of adhesion is, as a practical matter, required by law. (*Id.* at pp. 247–248.)

7

"overwhelming bargaining power"].)  Greene and Honda argue Greene could not have had superior bargaining power because Vasquez had many options for purchasing a vehicle.  In the transaction at issue, Vasquez was likely able to choose from among some dozen vehicle manufacturers making hundreds of type of vehicles.  Further, as a consumer in a large urban area, he was able to choose from among several new car dealerships for each brand and even more used car dealerships, effectively pitting dozens of merchants against each other.  As Greene and Honda suggest, it is by no means certain Greene possessed the greater economic leverage in the negotiation of the vehicle purchase.

Superior bargaining power, however, does not necessarily depend upon greater economic leverage.  An inequality of bargaining power existed here, not because of the parties' relative economic leverage, but because of Greene's greater sophistication in the *nonfinancial* aspects of the transaction.  As a business devoted to selling vehicles, Greene has the resources and motivation to study the aspects of law relating to that business, to determine the most advantageous strategy for protecting those rights, and to embody those conclusions in a preprinted contract.  The ordinary consumer has neither the resources nor the time, and often not the skill, to make the same determination.  While a typical consumer may be perfectly capable of negotiating the financial aspects of the transaction—the vehicle type and features, the price, and the financing terms, if any—he or she normally lacks the knowledge and experience to negotiate the remaining contractual terms, even assuming such negotiation is possible.  As a result, with respect to *these* aspects of the transaction the seller has substantially greater bargaining power. (See *Reyes v. Liberman Broadcasting, Inc.* (2012) 208 Cal.App.4th 1537, 1547 ["It is not hard to see how informational asymmetry leads to unequal bargaining power; an individual unaware of her rights is unlikely to vigorously bargain over those rights.  An unsophisticated party may unknowingly concede her rights without asking for concessions, whereas a knowledgeable party may leverage her rights into a superior bargaining position"].)

8

Given the widely differing levels of sophistication and interest normally present when one party to a transaction presents another with a preprinted contract, courts must retain the right to review such contracts to ensure the party with the greater sophistication does not exploit " 'the clear danger of oppression and overreaching.' " (*Gentry, supra,* 42 Cal.4th at p. 469.)  As *Gentry* explained, the use of a take-it-or-leave-it contract is deemed to constitute procedural unconscionability because "a conclusion that a contract contains no element of procedural unconscionability is tantamount to saying that, no matter how one-sided the contract terms, a court will not disturb the contract . . . . [A] court would have no basis under common law unconscionability analysis to scrutinize or overturn even the most unfair or exculpatory of contractual terms."  (*Id.* at p. 470.)

## C. *Degree of Procedural Unconscionability*

"[T]here are degrees of procedural unconscionability.  At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability.  Although certain terms in these contracts may be construed strictly, courts will not find these contracts substantively unconscionable, no matter how one-sided the terms appear to be.  [Citation.]  Contracts of adhesion that involve surprise or other sharp practices lie on the other end of the spectrum." (*Gentry, supra*, 42 Cal.4th at p. 469.)

Although we conclude a sufficient degree of procedural unconscionability is present to trigger our examination of the terms of the Contract, we do not agree with Vasquez that Greene's conduct demonstrates a high degree of procedural unconscionability.  This is legally significant because, as noted above, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra,* 24 Cal.4th at p. 114.)

### 1. *Oppression*

We begin with the recognition that Greene's use of a preprinted, nonnegotiable contract is common in the modern commercial world.  As noted in *Gentry,* such contracts are "indispensable facts of modern life." (*Gentry, supra,* 42 Cal.4th at p. 469.)  They

9

have long been a feature of the purchase of insurance and high value goods, such as vehicles and homes, but they have become ubiquitous as commerce has moved to the Internet. It is virtually impossible to purchase or use software or acquire cellular telephone and other telecommunications services without being required to execute nonnegotiable licenses or other terms of purchase or use. When a transaction occurs over the Internet, not only is the contract nonnegotiable, but there is not even a person with whom to negotiate. Despite the negative connotations of the legal terms applied to the use of take-it-or-leave-it contracts—"oppression," "adhesion," and "unconscionability"— the very ubiquity of the practice precludes a conclusion that the use of a nonnegotiable contract, on its own, is in any way unethical. Indeed, given the substantial regulation of many modern consumer transactions, a preprinted contract may be the merchant's only means of ensuring its compliance with the law, and granting an employee the authority to negotiate puts that compliance at risk.

Viewed in this light, we do not view Greene's conduct during the process of contract execution, described by Vasquez in his declaration, as contributing to the procedural unconscionability of the transaction. While Vasquez contends he was not given the opportunity to read the contract, he does not claim Greene actively interfered with its review. Vasquez does not, for example, state that he attempted to read the Contract and was prevented from doing so, or asked to take the Contract to an attorney for review and was refused the opportunity, or was presented with a contract in a language he did not understand, or was told the sale was conditioned on his acceptance of the contract without review. (See *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1145 [finding procedural unconscionability on these grounds].) Nor did Greene attempt to coerce him into signing the contract by suggesting he could get no better terms elsewhere. (See *Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 822, 824.) Similarly, he does not claim any affirmative misrepresentations about the terms of the contract. (See *Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 622.) Rather, it appears the salesperson merely guided Vasquez through the preprinted contract, seeking his signature in appropriate places, without, on

10

his or her own initiative, pausing to allow Vasquez to read.  It has never been held that merchants have an obligation to "sit beside" a customer "and force them to read (and ask if they understand) every provision" in a contract.  (*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1156 (*Mission Viejo*) [insurance policy not unconscionable]; see *Robison v. City of Manteca* (2000) 78 Cal.App.4th 452, 459 [no procedural unconscionability where plaintiff presented with contract open to signature page but not prevented from reading it].)[7]

Importantly, this was a consumer contract, not an employment contract.  Although it is sometimes said the same unconscionability standards apply to all contracts (*Walnut Producers, supra*, 187 Cal.App.4th 634, 644), an exception must be made for employment contracts.  The Supreme Court has recognized that adhesion contracts of employment are particularly likely to be found to feature procedural unconscionability because of the critical importance of the employment relationship.  (E.g., *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659, 686, judgment vacated and case remanded (2011) ___ U.S. ___ [132 S.Ct. 496] ["contract terms imposed as a condition of employment are particularly prone to procedural unconscionability"]; *Armendariz, supra*, 24 Cal.4th at p. 115; *Ajamian v. CantorCO2E, L.P.* (2012) 203 Cal.App.4th 771, 796.)  Because of the importance of the employment relationship, burdens of disclosure and informed consent are placed on employers seeking to impose arbitration agreements that have not been imposed outside that relationship.  Conversely, conduct found objectionable in the employment context does not carry the same stigma in an ordinary consumer transaction.

---

[7] The claim Vasquez was not provided an opportunity to read the Contract is particularly unpersuasive here, since he signed the first sales contract three days before signing the identical contract that is the subject of his action.  As a practical matter, he had three days to review the Contract before he signed it.  If he did not review the Contract, it is because he chose not to.  Our holding of no "surprise" would, however, remain the same even if Vasquez had not been given the contract in advance.

11

## 2. *Surprise*

Nor do we agree with Vasquez that the arbitration clause was tainted by "surprise." Vasquez argues surprise on the basis of the densely packed nature of the contract, the placement of the arbitration provision on the reverse side of the contract from the signature page, the failure to require him to sign or initial the arbitration provision, and Greene's failure to bring the clause to his attention.

We decline to find surprise merely on the basis of the length or layout of the agreement. The use of a single, unusually long page with writing on both sides was, arguably, dictated by state law, which requires a vehicle installment sale contract to "be printed in type no smaller than 6-point" and "contain in a single document all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle." (§ 2981.9.) The vehicle sales industry has traditionally interpreted "single document" to mean "single sheet of paper." (See 92 Ops.Cal.Atty.Gen. 97, 100 (2009).)[8] While perhaps not conclusive, Greene's attempted compliance with a specific state statute on the format of the agreement certainly argues against a finding of procedural unconscionability on that ground. (*Pinnacle, supra,* 55 Cal.4th at pp. 247–248.) In any event, there is no reason to think a multi-sheet document would have been more easily understood. On the contrary, use of a multi-sheet document would have made it easier to "bury" the clause.[9]

---

[8] In an opinion issued at the end of 2009, after the Contract was signed, the Attorney General took issue with this requirement. Although noting the industry's long-standing interpretation of the statute as requiring a single-sheet document, the Attorney General opined, "While a single-sheet document, which forecloses the possibility of pages becoming detached, may serve these objectives [of the statute] well, the single document rule does not require that the document consist of only one sheet of paper." (92 Ops.Cal.Atty.Gen. 97, 100, *supra.*) We need not rule on the requirements of the statute and note only that Greene's interpretation is plausible and consistent with industry practice.

[9] Vasquez argues the use of a two-page document would have made the clause more evident, citing *Crippen v. Central Valley RV Outlet* (2004) 124 Cal.App.4th 1159, 1165. *Crippen,* however, did not address the impact of the state's vehicle sales regulatory statutes. Vasquez also argues the arbitration clause could have been placed in

12

While the Contract is certainly busy and long, with a welter of provisions, this appears in large part to be a result of the highly regulated nature of the transaction. Many of the provisions are affirmatively required by state and federal law, which closely regulate the terms of vehicle installment sales contracts. The Automobile Sales Finance Act contains detailed requirements for the disclosures in such contracts. (See generally 92 Ops.Cal.Atty.Gen. 97, 97–98, *supra*.) Section 2982 alone requires over 40 different disclosures. Various provisions specify the exact text, type size, and even type color for some and require at least two disclosures to be acknowledged by the buyer's signature. (See §§ 2982, subds. (h), (r); 2984.1.)[10] Other terms are prohibited. (§ 2983.7.)[11] A wholly separate federal regulation, Regulation Z (12 C.F.R. § 226.1 (2013)), must also be satisfied. (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 966.) As a result, the seller has only limited discretion in the content and composition of the contract. In this case, the printer of the document has made an apparent effort to enhance the comprehensibility of the document by grouping provisions together in separate, black-outlined boxes, breaking up the monotony of the presentation, and using titles in large, all-capitalized letters describing the subject matter of the provisions. Vasquez does not suggest Greene could have made the Contract shorter and less complex without compromising its legal substance. He does not, for example, contend that any of the provisions were unnecessary, let alone inserted into the agreement merely for the purpose

a separate agreement consistent with state law because it does not concern "the total cost and the terms of payment for the motor vehicle." (§ 2981.9.) This is by no means self-evident, and the seller who placed the clause in a separate document would be risking the enforceability of the sale. In any event, there is no guarantee placing the clause in a separate document would have made it more evident.

[10] Section 2982, subdivision (h) requires the buyer to acknowledge in writing a provision stating (1) unfair business practices may be referred to law enforcement authorities and (2) the terms of the contract cannot be changed by the seller unilaterally after signing. Section 2984.1 requires the buyer to acknowledge in writing the legal obligation to obtain vehicle insurance.

[11] Section 2983.7 prohibits, among other provisions, clauses that waive a legal defense of the buyer, waive a right of action to recover for the seller's illegal acts, grant certain powers of attorney, and allow the seller to sue in an inconvenient county.

of creating prolixity to disguise the arbitration clause. Given the legally complex nature of the transaction, we decline to find procedural unconscionability solely on the basis of the complexity of the sales contract.

More importantly, despite the complexity of the sales contract, the arbitration provision is obvious upon even a cursory read. Vasquez argues the clause is hidden because it is placed on the back of the document, but in a contract containing only two pages, a provision does not become hidden merely by being placed on the back. A consumer can be expected to turn the contract over. We are reluctant to cast all provisions on the back into the shadow of unconscionability, particularly because, under state law, placing all provisions on the front arguably would have required a single, 52-inch sheet of paper. (§ 2981.9.) Further, the fact of the writing on the reverse side is hardly hidden. The face page of the document contains an acknowledgment above the signature line that the purchaser has read "BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION CLAUSE ON THE REVERSE SIDE, BEFORE SIGNING BELOW."[12]

When the document is flipped, the arbitration clause occupies the bottom third of the page, in a box outlined in black. In all capitals and bold, at the top, it states: "**ARBITRATION CLAUSE [¶] PLEASE REVIEW—IMPORTANT—AFFECTS YOUR LEGAL RIGHTS**." Directly underneath, again in all capitals, it states, "EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL." There is no attempt to hide or disguise the clause, and the most important legal element of the clause, the waiver of court proceedings, is plainly and prominently stated. Many decisions have found no surprise when an arbitration clause is captioned in large, bold

---

[12] Vasquez notes that because this provision is on the right-hand side of the page, it is not located *directly* above the signature line for the buyer; rather, it is above the adjacent signature line for a "Co-buyer." We are not persuaded the provision is significantly less visible to a buyer merely because it is placed a couple inches to the right of center.

type and presented in type no smaller than the remainder of the contract.  In *Pinnacle,* the Supreme Court recently found no surprise when "the arbitration provisions . . . appear in a separate article under a bold, capitalized, and underlined caption titled 'ARTICLE XVIII CONSTRUCTION DISPUTES,' and within a separate section with the bold and underlined title, 'Section 18.3.  Resolution of Construction Disputes by Arbitration.'  The provision . . . describing the waivers of jury trial and right to appeal, are set forth in separate subsections of section 18.3, with the latter appearing in bold and capital letters. . . . Additionally, the recitals on page 2 . . . state, in capital letters, that article XVIII of the declaration 'refers to mandatory procedures for the resolution of construction defect disputes, including the waiver of the right to a jury trial for such disputes.' " (*Pinnacle, supra,* 55 Cal.4th at p. 247, fn. 12.)[13]  The presentation of the arbitration clause in the Contract is not materially different from this.

When applied to a complex contract such as this, particularly one in which certain of the disclosures are required by statute, Vasquez's argument places the merchant in a

---

[13] Other cases have come to a similar conclusion.  (See *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 737 [no surprise where arbitration clause "located at the top of the second page in a two-page document with the heading 'Arbitration' in boldfaced font"]; *Mission Viejo, supra,* 197 Cal.App.4th at p. 1150, 1156 [no surprise where arbitration clause "clear and conspicuous" with a title in capital letters]; *Walnut Producers, supra,* 187 Cal.App.4th at p. 647 [no surprise where arbitration clause in same size type as remainder under a heading " 'Dispute Resolution' "]; *Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1571 (*Parada*) [no surprise where arbitration provisions have headings in bold describing their substance]; *Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 582 [no surprise where arbitration provision  not disguised or hidden and disclosed in a sticker on the box]; *Greenbriar Homes Communities, Inc. v. Superior Court* (2004) 117 Cal.App.4th 337, 345, disapproved on other grounds in *Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 545, fn. 5 [no procedural unconscionability when provision written in same sized font as the remainder and easily understood]; compare *Samaniego v. Empire Today, LLC, supra,* 205 Cal.App.4th at p. 1146 [surprise found where arbitration clause neither flagged by an individual heading nor required to be initialed]; *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89 (*Gutierrez*) [surprise found where arbitration clause "particularly inconspicuous, printed in eight-point typeface on the opposite side of the signature page"].)

proverbial "Catch-22." Any attempt to make one clause more conspicuous inevitably makes every other clause less conspicuous. By attempting to avoid an argument of "surprise" with respect to one provision, the merchant risks having the same argument made with respect to any other provision not given more prominent treatment. Placing the arbitration agreement next to the signature line, for example, would have forced other, equally or more important provisions into a subsidiary role. Placing it on the front page would have forced some other provision to the back. All provisions could have been placed on the front page of the document, of course, but the effort would have required a 52-inch contract. Ultimately, the merchant has no choice but to make compromises regarding the placement and relative importance of contractual provisions. We are satisfied the Contract represents a good faith effort to make the consumer aware of the various significant provisions of the agreement.

Nor do we find surprise from Vasquez's failure to read the Contract and his consequent ignorance of the presence of the arbitration clause. While we realize there is authority to the contrary (see *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1290–1291 (*Bruni*) and cases cited therein), we find ourselves in disagreement with the reasoning of these cases. The ordinary rule of contract law is, " 'in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it.' " (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1588.) This principle has been applied by the Supreme Court in the context of at least one contract of adhesion. (*Casey v. Proctor* (1963) 59 Cal.2d 97, 104–105 [plaintiff's failure to read preprinted release does not excuse enforcement]; see also *Pinnacle, supra*, 55 Cal.4th at p. 236 ["An arbitration clause within a contract may be binding on a party even if the party never actually read the clause"].)

In *Bruni,* the court declined to apply this ordinary rule, holding "failure to read the contract helps 'establish actual surprise,' " on the theory a contract of adhesion involves " ' "overreaching" ' " or " ' "imposition." ' " (*Bruni, supra*, 160 Cal.App.4th at p. 1291.) As discussed above, however, in modern consumer transactions the mere use of a

16

preprinted form cannot fairly be characterized as either overreaching or imposition. More important, to find surprise on the basis of a consumer's declared failure to read a contract—in this case, in spite of his written affirmation that he had, in fact, read the contract and three days' possession of an identical form prior to signing—discourages diligence by penalizing the consumer who admits to reviewing a preprinted contract. It risks making an arbitration clause enforceable against one consumer and not another merely because the first consumer was diligent. In this way, Vasquez's argument subverts the very premise of contract law, that " ' "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." ' " (See *Mission Viejo, supra,* 197 Cal.App.4th at pp. 1154–1155.)[14]

Finally, Vasquez contends Greene acted unconscionably in failing to present him with a copy of the AAA rules. The arbitration clause does not, however, require the use of any particular arbitration organization. It proposes two default organizations at the choice of the buyer and permits any other organization by agreement of the parties. Accordingly, presentation of the rules of any particular organization would be premature and could be viewed as coercive. In any event, Vasquez cites us to no decisions in which this requirement has been applied outside the context of employment contracts, which, as noted, are subject to more stringent requirements of procedural unconscionability. We decline to extend it outside that unique context.

**D.** *Substantive Unconscionability*

Vasquez contends several aspects of the arbitration clause make it substantively unconscionable, including the provisions governing the request for a second arbitration, the cost advance provision, the exclusion of self-help remedies, and the class action waiver.

---

[14] For similar reasons, we reach the same conclusion with respect to Vasquez's claim it was unconscionable for the Greene employee who supervised the signing not to bring the arbitration clause to his attention. (See *Mission Viejo, supra,* 197 Cal.App.4th at p. 1154.)

17

Greene and Honda argue the standard for substantive unconscionability in California is inconsistent, since some decisions have struck down arbitration clauses if their provisions are found "one-sided," while other decisions have applied a facially more tolerant standard by declining to invalidate provisions unless they "shock the conscience." The Supreme Court appears to have reconciled these two standards in its most recent pronouncement on the standard for substantive unconscionability, *Pinnacle*. In that case, the court initially noted, "Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." (*Pinnacle, supra,* 55 Cal.4th at p. 246.) It then added the qualification, "A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." ' " (*Ibid.*) Accordingly, one-sidedness, standing alone, is not sufficient to qualify an arbitration clause as substantively unconscionable.

The Supreme Court's seminal decision in *Armendariz* is helpful in giving a functional meaning to the inherently subjective "shock the conscience" standard. Discussing prior authority, the court noted, "We conclude that *Stirlen* [*v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519] and *Kinney* [*v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322] are correct in requiring [a] 'modicum of bilaterality' in an arbitration agreement. Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on 'business realities.' As has been recognized ' "unconscionability turns not only on a 'one-sided' result, but also on an absence of 'justification' for it." ' [Citation.] If the arbitration system established by the employer is indeed fair, then the employer as well as the employee should be willing to submit claims to arbitration. Without reasonable justification for this lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage. Arbitration was not intended for this purpose."

18

(*Armendariz, supra,* 24 Cal.4th at pp. 117–118.) The court returned to the "justification" issue later in the decision, noting in its holding, "We emphasize that if an employer does have reasonable justification for the arrangement—i.e., a justification grounded in something other than the employer's desire to maximize its advantage based on the perceived superiority of the judicial forum—such an agreement would not be unconscionable." (*Id.* at p. 120.) In other words, substantive unconscionability adheres only if a one-sided provision has no objective justification other than to tilt the arbitration scales in the favor of the clause's author. It is the attempt to make the arbitration proceeding something other than a fair forum that "shocks the conscience."

From that perspective, we review the various aspects of the clause cited by Vasquez as unfair.

### 1. *Costs of Arbitration*

Vasquez contends it is substantively unconscionable to require him to pay his own costs of arbitration. Although the Contract provides that Greene must advance the first $2,500 of the buyer's arbitration costs, the buyer is responsible for costs above this amount, and the advance may be recovered by Greene in the arbitrator's award.[15] Vasquez has failed to carry his burden of creating the factual record necessary to prevail on this claim.

In *Gutierrez, supra*, 114 Cal.App.4th 77, the court held "where a consumer enters into an adhesive contract that mandates arbitration, it is unconscionable to condition that process on the consumer posting fees he or she cannot pay." (*Id.* at p. 89, fn. omitted.) Outside of employment claims, however, neither *Gutierrez* nor any other California decision has found that an arbitration clause requiring a plaintiff to pay arbitration costs is

---

[15] The agreement provides: "We will advance your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $2500, which may be reimbursed by decision of the arbitrator at the arbitrator's discretion. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law."

19

*per se* unconscionable.[16]  Instead, in *Gutierrez* and *Parada, supra,* 176 Cal.App.4th 1554, the courts held that the substantive unconscionability of provisions in consumer (*Gutierrez*) and financial (*Parada*) agreements requiring the claimant to pay his or her own arbitration costs must be evaluated on a "case-by-case basis," with the outcome dependent on the ability of the claimant to pay, the anticipated costs of the arbitration, and the amount at issue in the arbitration.  (*Gutierrez,* at pp. 97–98; *Parada,* at pp. 1580–1581.)  The consumer has the burden of demonstrating the clause unconscionable on these grounds, necessarily by submitting evidence on the relevant issues.  (*Gutierrez,* at p. 97.)

The United States Supreme Court has similarly declined to find an arbitration clause invalid on grounds of expense when the plaintiff failed to provide evidence he or she could not afford the arbitration, holding:  "To invalidate the agreement on that basis would . . . . conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.  [Citations.]  We have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue.  [Citations.]  Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  (*Green Tree Financial Corp.-Ala. v. Randolph* (2000) 531 U.S. 79, 91–92.)

Our Legislature has also stopped short of declaring arbitration clauses in a consumer contract invalid solely because they require a consumer to bear his or her own costs of arbitration.  Code of Civil Procedure section 1284.3, subdivision (a) proscribes arbitration clauses "requiring that a consumer who is a party to the arbitration pay the fees and costs incurred by *an opposing party* if the consumer does not prevail in the

---

[16] In *Armendariz* and *Little*, the Supreme Court required employers to pay the costs of arbitration in certain statutory employment cases.  The court declined to extend that rule outside the employment context in *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 507–508.

20

arbitration." (Italics added.) It does not, however, invalidate an arbitration clause that requires the consumer to bear his or her *own* fees.

Accordingly, to demonstrate substantive unconscionability on grounds of affordability, Vasquez was required to submit evidence of his own financial resources, the reasonably anticipated cost of this particular arbitration, and the amount of the potential award. Because Vasquez provided no evidence of indigence, let alone the likely cost and value of his proposed arbitration, he failed to carry his evidentiary burden in demonstrating substantive unconscionability on this ground.

### 2. *"Appeal" Rights*

On several grounds, Vasquez challenges the "appeal" provision of the arbitration clause, which permits either party to request a second arbitration before three arbitrators if the first arbitration, conducted before a single arbitrator, results in injunctive relief or an award of $0 or more than $100,000.[17] Vasquez first argues the $100,000 threshold is one-sided because the buyer is far more likely than the seller to receive an award of that size.

The argument fails to consider the full scope of the clause, which contains two thresholds for an appeal, not one. The first is an award of $0—the equivalent of a defense verdict. As a result, a party can request a new arbitration if it seeks an award in arbitration and is denied a recovery. Given the limited range of affirmative claims available to a seller, this provision is likely to be used more often by buyers. The provision allowing appeal of an award in excess of $100,000 is presumably of more value to sellers, but that value is likely limited, since only the most expensive vehicles have a replacement cost in excess of $100,000. In any event, the clause as a whole is not one-

---

[17] The precise language of the clause is as follows: "The arbitrator's award shall be final and binding on all parties, except that in the event the arbitrator's award for a party is $0 or against a party is in excess of $100,000, or includes an award of injunctive relief against a party, that party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. The appealing party requesting a new arbitration shall be responsible for the filing fee and other arbitration costs subject to a final determination by the arbitrators of a fair apportionment of costs."

sided because this appeal right is balanced by the corresponding right to a second arbitration in the event of an award of $0. This balance distinguishes the clause from the provision found unconscionable in *Little, supra,* 29 Cal.4th 1064, which permitted only the appeal of an award in excess of $50,000. (*Id.* at p. 1070.) *Little* struck down the provision because it was "asymmetrical," allowing appeals of awards against the employer but rarely allowing an appeal to the employee. (*Id.* at p. 1073.) Because it allows the appeal of a "defense" award, the sales contract is not similarly asymmetrical.

Vasquez also argues the appeal provisions are unfair because they permit a second arbitration if injunctive relief is granted but not if such relief is requested but denied. We agree with Vasquez this provision will be of primary benefit to the seller, which seems more likely to be the subject of injunctive relief. Yet we find the allowance of an appeal in the event of injunctive relief to be justified by " 'business realities.' " (*Armendariz, supra*, 24 Cal.4th at p. 117.) Depending on its nature, injunctive relief could have a substantial, continuing effect on a business. As Greene and Honda argue, it could "force the dealership to change its actions with respect to *future* customers and *future* sales." Given the potential significance of this result for a seller's business, it is proper to preserve the right to challenge such an award.

While it is true the clause does not allow an equivalent appeal to a claimant denied injunctive relief, the one-sided impact of the provision is mitigated by the claimant's right to appeal a $0 award. In most cases in which injunctive relief is requested and denied, a monetary award will also be denied, triggering the right to request a second arbitration. As discussed above, a provision is not substantively unconscionable merely because it is "one-sided"; it must be so one-sided as to shock the conscious. Because a claimant denied injunctive relief will, as a practical matter, ordinarily be entitled to request a second arbitration, the actual one-sidedness of this aspect of the appeal provision is sufficiently minimal that it cannot be said to shock the conscience.

Vasquez next challenges the requirement in this provision that the appealing party pay the costs of the second arbitration, pending possible reallocation by the arbitrators. On its face, the provision is even-handed, since it applies equally to buyers and sellers.

22

Further, it has two possible justifications. First, by requiring a substantial initial investment, it discourages disappointed parties from appealing, thereby promoting the efficiency and finality of the arbitration process. Second, and potentially more important, it mitigates the adverse financial impact of the appeal provision for the nonappealing party by requiring a party demanding a second arbitration initially to cover the associated costs.[18] This is a distinct benefit to a buyer if the seller requests a second arbitration, since the buyer will not be required to pay the upfront costs of defending his or her award from the first arbitration.

In challenging the requirement, Vasquez relies heavily on *Gutierrez*, but that decision is distinguishable in two important ways. First, as discussed above, *Gutierrez* did not purport to invalidate all arbitration clauses that required a nondrafting party to pay arbitration fees. Rather, *Gutierrez* was, in effect, an "as applied" decision; the arbitration clause was held to be substantively unconscionable as to the particular plaintiffs because they provided affirmative evidence they could not afford to arbitrate. (*Gutierrez, supra*, 114 Cal.App.4th at pp. 85 [plaintiffs submitted evidence of "their monthly net income and expenses and their savings"], 90 [calculating expected fees].) Because Vasquez has provided no similar evidence, we have no evidentiary basis for finding he cannot afford a second arbitration.

Second, *Gutierrez* concerned the fees for an initial arbitration. The provision attacked by Vasquez concerns a second arbitration brought for the purpose of challenging the result of an initial arbitration. The equities are quite different in that situation, since the party required to bear the costs has already had a hearing and received a decision with respect to his or her claim. The imposition of upfront costs therefore does not deny an arbitral forum to the party, but only the opportunity for a second bite at the apple. Because an "ordinary" arbitration clause merely provides the very limited review available in a judicial forum (Code Civ. Proc., § 1286.2; *Haworth v. Superior Court*

---

[18] If not for the provision allowing later reallocation, this provision would arguably be invalid under Code of Civil Procedure section 1284.3, subdivision (a), which precludes a consumer from being required to pay an opposing party's expenses.

(2010) 50 Cal.4th 372, 380), the provision confers a significant benefit on unsuccessful claimants who feel strongly enough about their claims to risk the expense of a second arbitration. Making the claimant pay the initial costs to gain this benefit is not an unreasonable trade and is, of course, balanced by the same obligation on the part of a seller appealing an award in excess of $100,000.

Given the justifications and equities discussed above, we do not find the requirement to pay initially all costs of an appellate arbitration to be so one-sided as to shock the conscience. While recognizing the provision might be invalid on a case-by-case basis, for which we have no evidentiary support here, we cannot say requiring an appealing party initially to bear the expense of a second arbitration is per se unconscionable.

### 3. *Exempting Self-help and Small Claims*

Vasquez next challenges the arbitration clause's exemption of the remedy of repossession and of disputes within the jurisdictional amount of the small claims court.[19]

Vasquez argues this provision is one-sided, but that is by no means obvious. Certainly the exemption of repossession is made only for the benefit of the seller, the only party that can take advantage of the remedy. Exempting small claims, however, would appear to balance this provision by benefitting buyers at least as much as sellers, since many buyers' disputes will have a relatively small monetary value. While it is true, as Vasquez points out, that some sellers' claims for nonpayment could be pursued in small claims, we have no basis, in the absence of actual evidence, for presuming sellers would use small claims court proportionately more than buyers.

Yet even if this exemption did tend to benefit the seller, there is a plain and sufficient justification for carving out these remedies that has nothing to do with creating an unfair forum for dispute resolution. Arbitration is intended as a substitute for judicial

---

[19] The clause states: "You and we retain any rights to self-help remedies, such as repossession. You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court."

24

proceedings. (*Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P.* (2008) 44 Cal.4th 528, 539 ["The policy in favor of enforcing arbitration agreements [citation] is based on the assumption that 'parties have elected to use [arbitration] as an alternative to the judicial process' "].) Repossession and other self-help remedies by definition operate outside such proceedings. Repossession, governed by statute in California (Bus. & Prof. Code, § 7500 et seq.; Civ. Code, § 2983.2 et seq.), is intended to provide an expeditious remedy for nonpayment, avoiding the time and expense of judicial proceedings. Exempting it from arbitration preserves this efficiency. To bring repossession inside the dispute resolution system by, presumably, requiring a seller to arbitrate its right to repossess would frustrate the purpose of its statutory exclusion from judicial proceedings. In this way, the clause merely preserves the status quo; a buyer who has no right to litigate prior to repossession also has no right to arbitrate.

The same considerations support the exclusion of small claims matters. Those, too, are exempted from full judicial process as a means of achieving efficiency and avoiding unnecessary expense. To bring them within the arbitration process would risk frustrating those objectives. Indeed, a clause that purported to require arbitration of small claims matters might well be attacked as unconscionable precisely because it thwarted their efficient resolution.

### 4. *Class Waiver and Arbitration of "Public" Claims*

Finally, Vasquez argues the waiver of class action rights and the requirement to arbitrate "public" claims, such as the statutory violations alleged here, are impermissible. (See *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 (*Discover Bank*); *Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303.) Both arguments have been foreclosed by the United States Supreme Court's decision in *AT&T Mobility, LLC v. Concepcion* (2011) 131 S.Ct. 1740 (*Concepcion*), which found preemption by the Federal Arbitration Act (9 U.S.C. § 1 et seq.). (See *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 769; *Nelsen v. Legacy Partners Residential, Inc.* (2012) 207

Cal.App.4th 1115, 1136–1137.)[20]  Although *Concepcion* expressly considered only *Discover Bank*'s judicially created ban on class action waivers as unconscionable, the same rationale would require a finding of preemption of the statutory ban on class action waivers in section 1751, which is similarly based on public policy.

## E.  *Enforcement of the Arbitration Clause*

As discussed above, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra,* 24 Cal.4th at p. 114.)  While we find the Contract to be procedurally unconscionable, we also conclude it was only minimally so, given the absence of evidence of "surprise or other sharp practices." (*Gentry, supra,* 42 Cal.4th 443, 469.)  As a result, a substantial degree of substantive unconscionability would be required to defeat enforcement of the clause.  In the above discussion, the only suggestion of substantive unconscionability we found was the failure of the clause to permit an "appeal" arbitration in the event a buyer sought and was denied injunctive relief.  Because this asymmetry is mitigated by the provision permitting a second arbitration if a buyer is denied a monetary recovery, we conclude it did not rise to the level of substantive unconscionability.  Accordingly, there is no basis for declining to enforce the parties' agreement to arbitrate.

Because we find minimal unconscionability, we do not address Greene and Honda's arguments regarding severability and the purported bias in California law against the enforcement of arbitration agreements.

---

[20] We also reject Vasquez's argument that the contract is substantively unconscionable because it requires Vasquez to give up the right to judicial determination of certain statutory rights without requiring Greene and Honda to give up similar rights of their own.  Putting aside Vasquez's failure to specify exactly what rights he has in mind that Greene and Honda might sacrifice, a lack of unconscionability has never been held to depend on this type of tit-for-tat exchange.

## III.  DISPOSITION

The trial court's order denying the petition to compel arbitration is reversed.  The matter is remanded to the trial court for entry of an appropriate order directing arbitration under the terms of the sales contract.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

Trial Court:   Solano County Superior Court

Trial Judge:   Hon. Robert S. Bowers

Counsel:

Toschi, Sidran, Collins & Doyle, David R. Sidran and Thomas M. Crowell for Defendants and Appellants.

Rosner, Barry & Babbitt, Hallen D. Rosner, Christopher P. Barry and Angela J. Smith for Plaintiff and Respondent.